UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATASHA S. BRANCH, Plaintiff, | ) | |
| v. | ) | Dkt. No. 3:23-cv-30110-CLM |
| CENTER FOR HUMAN DEVELOPMENT, Defendant. | ) | |

**MEMORANDUM & ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Dkt. No. 73)

## I. Introduction

In this proceeding, self-represented plaintiff Natasha S. Branch ("Plaintiff") asserts claims against her former employer Center for Human Development ("Defendant" or "CHD") for unlawful discrimination based on race, hostile work environment (characterized by Plaintiff as "harassment"), and retaliation for engaging in protected activity (Dkt. No. 1). The parties consented to this court's jurisdiction for all purposes through trial (Dkt. No. 89). *See* Fed. R. Civ. P. 73(b); 28 U.S.C. § 636(c). Pending before the court is Defendant's motion for summary judgment (Dkt. No. 73). For the reasons set forth below, the motion is GRANTED as to Plaintiff's claims of race discrimination and hostile work environment but DENIED as to Plaintiff's claim of retaliation.

## II. Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' when a rational factfinder could resolve it [in] either direction." *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir. 2018) (citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)), *rev. denied*, 885 F.3d 52 (1st Cir. 2018). "A fact is 'material' when its (non)existence could change a case's outcome." *Id.* (citing *Borges*, 605 F.3d at 5).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325), *aff'd*, 442 F.3d 7 (1st Cir. 2006). If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute . . . ." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325).

The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor. *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)). "Although pro se pleadings

must be ‘liberally construed [and are] held to less stringent standards than formal pleadings drafted by lawyers,’ pro se plaintiffs must still comply with the specificity requirements of Fed. R. Civ. P. 56.” *Karimpour v. Stanley Black & Decker, Inc.*, 749 F. Supp. 3d 203, 207 (D. Mass. 2024) (alteration in original) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)) (citing *Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir. 1988)), *reconsideration denied*, 779 F. Supp. 3d 68 (D. Mass. 2025).

**III. The Record**

Local Rule 56.1 serves to establish the summary judgment record. “Local Rule 56.1 is ‘designed to function as a means of “focusing a district court’s attention on what is—and what is not—genuinely controverted.”’” *Plourde v. Sorin Grp. USA, Inc.*, 517 F. Supp. 3d 76, 81 (D. Mass. 2021) (quoting *Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007)). It provides, in part:

> Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation. . . . A party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation.

L.R., D. Mass. 56.1. “Where a party opposing a motion for summary judgment fails to comply with Local Rule 56.1, the court has the discretion to decide whether to impose the sanction of deeming the moving party’s factual assertions to be admitted.” *Butters v. Wells Fargo Advisors, LLC*, 10-cv-10072, 2012 WL 5959986, at

*2 (D. Mass. Nov. 27, 2012) (citing *Swallow v. Fetzer Vineyards*, 46 F. App'x 636, 638-39 (1st Cir. 2002); *Brown v. Armstrong*, 957 F. Supp. 1293, 1297 (D. Mass. 1997), *aff'd*, 129 F.3d 1252 (1st Cir. 1997)). *See* L.R., D. Mass. 56.1 ("Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.").

In deciding whether to sanction a non-compliant party who is proceeding pro se, the court may consider the party's circumstances. *Willitts v. Engie N. Am. Inc.*, No. 20-cv-11255-ADB, 2023 WL 2573344, at *2 (D. Mass. Mar. 20, 2023) (citing *Grossman v. Martin*, 566 F. Supp. 3d 136, 143 (D.R.I. 2021)). "Courts . . . 'are solicitous of the obstacles that pro se litigants face, and while such litigants are not exempt from procedural rules, [courts] hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects.'" *Id*. at *2 (quoting *Dutil v. Murphy*, 550 F.3d 154, 158 (1st Cir. 2008)).

In this instance, Plaintiff filed an "Answer to [Defendant's] Motion for Summary Judgment" but no Local Rule 56.1 counterstatement (Dkt. No. 78). In her "Answer," Plaintiff responded to certain of Defendant's claimed undisputed facts, either individually or in groups, in narrative form and with no citations to supporting affidavits, deposition transcripts, or other documentation. Plaintiff included various email correspondence and the results of an internal investigation by Defendant as exhibits to her pleading.

In the court's view, while Plaintiff did not comply with the letter of Local Rule 56.1, she did endeavor to "assist[ ] the Court in determining which facts are genuinely in dispute." *Willitts*, 2023 WL 2573344, at *2. Accordingly, the court exercises its discretion and does not deem the entirety of Defendant's statement of undisputed facts admitted. Instead, the court deems admitted only those of Defendant's undisputed facts as to which the court's parsing of the record reveals no contradictory evidence. Where contradictory evidence regarding a material fact appears in the record, the court treats the fact as disputed.

## IV. Facts

On August 12, 2019, Defendant, a non-profit organization that provides community-oriented human services, hired Plaintiff, a Black woman, on a part-time, per diem basis in its "Meadows Homes" residential program (DF ¶¶ 1, 4).[1] The Meadows Homes program consists of multiple group residences serving as permanent homes for individuals who have been referred by the Massachusetts Department of Developmental Services and require constant care by direct care workers with clinical and nursing support (DF ¶¶ 2-3). Plaintiff was hired as "Relief Staff," whose duties include assisting residents with daily activities as part of a team under the direction of a Residential Supervisor (DF ¶ 6). Like other Relief Staff, Plaintiff was hired to work on an as-needed basis and was not guaranteed assignment to a particular home (DF ¶ 7). That said, during her tenure, Plaintiff

[1] Defendant's facts as set forth in its Local Rule 56.1 statement at Dkt. No. 73-2 are referred to as "DF ¶ _."

spent most of her shifts at a home on Parenteau Drive, though she was cross-trained and worked at other group home locations as needed (DF ¶ 8).

Several months after Plaintiff's hiring, on January 23, 2020, Defendant issued Plaintiff a final written warning regarding her continued employment (DF ¶ 10; Dkt. No. 73-4, at 161). According to the document, the warning was meant to address Plaintiff's having been found asleep during an awake shift on January 10, 2020, as well as a statement Plaintiff purportedly made that she did not want to communicate with the supervisor at Parenteau Drive and instead would only work with the assistant supervisor (Dkt. No. 73-4, at 161). Plaintiff disputes that she was sleeping during an awake shift but acknowledges "refus[ing] to work directly with . . . [the] house supervisor" because she had treated Plaintiff disrespectfully during a staff meeting (Dkt. No. 78, at 1). This was Plaintiff's only discipline leading up to the events that form the basis for the instant lawsuit (*id.*).

On Friday, March 11, 2022, Plaintiff was involved in an altercation with a Parenteau Drive resident who had mental health struggles and a history of conflict and violence with other staff members (DF ¶ 16; Dkt. No. 73-4, at 117; Dkt. No. 78, at 2). On this occasion, the resident sustained a bloody nose and accused Plaintiff of causing the injury (DF ¶ 16). The parties agree that emergency responders were called, although they dispute who made the call, and agree that the resident in question left Parenteau Drive to stay overnight with family (DF ¶ 17; Dkt. No. 78,

at 2). According to Plaintiff, she finished out her shift that Friday night (Dkt. No. 78, at 2).

Defendant claims that, effective March 12, 2022, it removed Plaintiff from Parenteau Drive "until the matter was resolved," but provides no evidentiary support for the assertion (DF ¶ 20). For her part, Plaintiff reports working at Parenteau Drive on March 13, 2022, until being asked to switch locations at 8:00 p.m., with only three hours left on her shift, because the resident was returning to the home (Dkt. No. 78, at 2). Plaintiff's recollection is corroborated by an email from her then-supervisor, Ashleigh Rucks, stating that Plaintiff worked at Parenteau Drive until about 7:45 p.m. on March 13, 2022, when Rucks asked her to switch houses (Dkt. No. 73-4, at 175).

According to Plaintiff, Rucks initially told her that she was being taken off the schedule until further notice and without offering her any alternative shifts (Dkt. No. 78, at 2). Plaintiff asked Rucks how long she would be off of the schedule, and Rucks responded that it might be for about one week (*id.*). Plaintiff sent an email to Winde Whitaker, the Director of the Meadows Homes Program, that Sunday evening, March 13, 2022, stating that she was feeling "undervalued" and believed that staff safety concerns regarding the resident had not been properly addressed (DF ¶ 23; Dkt. No. 73-4, at 179). Whitaker responded the following afternoon, March 14, 2022, telling Plaintiff that, while "it m[ight] not feel like it, the move[ ] is to protect you from further abuse and allegations," in addition to giving the company time "to process the situation" and the resident "time to decompress"

(DF ¶ 29; Dkt. No. 73-4, at 178). When Plaintiff responded that "[a]ll of [her] hours were taken and [she] wasn't even offered an alternative," Whitaker replied that Plaintiff was "not suspended and . . . ha[d] been asked to switch sites" (DF ¶¶ 31-32; Dkt. No. 73-4, at 177-78). Defendant represents that it was implementing a safety-based protocol, consistent with its standard operating procedure, by removing Plaintiff from the Parenteau Drive home until the matter was resolved (DF ¶¶ 20-21). Inexplicably, however, Defendant cites only portions of Plaintiff's deposition transcript for support, which Plaintiff's testimony does not supply (*id.*).

Before Whitaker responded to Plaintiff's email on March 14, 2022, Plaintiff sent an email to Tammy Nothe-Hebert, the Vice President of Disability and Elder Services, complaining that Whitaker had not "even acknowledge[d]" her email, that she had been "taken off the schedule until further notice," and that Whitaker "has said a few racially insensitive things to the ladies in the Parenteau house who are all people of color" (DF ¶¶ 24-26; Dkt. 73-4, at 181-82). According to Plaintiff's email, Whitaker had previously been her manager, and Plaintiff had "work[ed] many, many hours for her and [they] seemed to have a great report [sic]" (DF ¶ 27; Dkt. No. 73-4, at 181). However, Plaintiff goes on to represent that, since being promoted, Whitaker "would tell lies on [her] and tell other supervisors not to let [her] work in their houses," and "would lie and say that [Plaintiff] was in overtime

when [she] wasn't just so the supervisors wouldn't ask [Plaintiff] to work" (DF ¶ 27; Dkt. No. 73-4, at 181).

On March 15, 2022, Whitaker emailed Plaintiff to confirm that Rucks had offered Plaintiff hours at other sites, but Plaintiff did not want to work at that time (DF ¶ 34; Dkt. No. 73-4, at 185-86). Whitaker stated, "[w]e are willing to offer you the same hours that you were working at Parenteau at another site," but noted "[i]t is fine in the meantime for you to use your PTO until you decide to work or that runs out" (Dkt. No. 73-4, at 185). Whitaker ended her email by stating that Rucks could "let her know if anything changes at Parenteau and we can welcome you back. We all hope that is sooner rather than later" (*id.*). Plaintiff responded the next morning, disputing that she had been offered hours at any other site, or provided hours or phone numbers for other sites so that she could make her own schedule (*id.*). Allison Cartabona, Plaintiff's manager who had been copied on the emails, replied to Plaintiff indicating that Plaintiff could work the same schedule that she had at Parenteau Drive at two of six other sites, and she provided Plaintiff with the names and phone numbers of the house supervisor at each of those six sites (DF ¶¶ 19, 36; Dkt. No. 73-4, at 184). Notwithstanding what Plaintiff claims she was initially told by Rucks, Plaintiff does not dispute that she was able to pick up shifts at other group home locations in her same position and at her normal rate of pay following the incident (DF ¶ 20).

On or about March 15, 2022, the Disabled Persons Protection Commission ("DPPC") opened an investigation into an allegation of abuse by the resident against

Plaintiff in connection with the March 11 incident (DF ¶ 38; Dkt. No. 73-4, at 168-171). On March 23, 2022, Plaintiff emailed Whitaker inquiring whether she was to return to her scheduled shifts at Parenteau Drive (DF ¶ 40; Dkt. No. 73-4, at 191). Whitaker responded that because there was an active DPPC investigation, Plaintiff would have "to continue to work at other homes until the investigation has been resolved and recommendations have been made" (DF ¶ 38a; Dkt. No. 73-4, at 191).[2] Whitaker offered Plaintiff help in setting up a regular schedule in the meantime if she was interested (Dkt. No. 73-4, at 191). Plaintiff replied, claiming that Whitaker never sent her the list of supervisors that needed help, to which Whitaker responded that the list had not changed since Cartabona sent it to Plaintiff on March 16 (DF ¶¶ 39a-40a; Dkt. No. 73-4, at 184, 190). Nevertheless, Whitaker indicated that since Plaintiff was requesting help, she would text the team to inquire about availability that night and get back to her; Whitaker also requested to know what Plaintiff's permanent hours at Parenteau Drive had been (DF ¶ 40a; Dkt. No. 73-4, at 190). Plaintiff replied, taking issue with the fact that Whitaker had not acknowledged her request for contact information for the supervisors, to which Whitaker responded that she was following the chain of command by letting Cartabona, who was the first link in Plaintiff's chain, respond (Dkt. No. 73-4, at

---

2 Defendant's statement of facts contains a numbering error on page seven, where the paragraphs that should be numbered 41 through 43, repeat numbers 38 through 40. There is another numbering error on page ten, where there are two paragraphs numbered 55. To avoid any confusion, any repeated paragraph numbers are cited herein with an "a" after the paragraph number; i.e., the second paragraph numbered 38 is cited as paragraph "38a." All other paragraph cites match the numbers in Defendant's statement of facts.

189). When Plaintiff commenced this email correspondence with Whitaker on March 23, 2022, she copied Rucks, Cartabona, Nothe-Hebert, and Jim Goodwin, all of whom continued to be copied throughout the thread (Dkt. No. 73-4, at 188-91). On Saturday, March 26, 2026, Nothe-Hebert chided Plaintiff for copying so many unnecessary people and advised her to email directly with Whitaker (Dkt. No. 73-4, at 188).

Several weeks later, on April 14, 2022, Plaintiff emailed Whitaker, copying Nothe-Hebert and Goodwin, stating, "I have received the report from DDS and they have confirmed that the accusations are not substantiated" (DF ¶ 47; Dkt. No. 73-4, at 194-95). Indeed, the assigned DPPC investigator had authored a report dated March 28, 2022, finding the resident's abuse allegation unsupported and requesting the case be closed (DF ¶ 46; Dkt. No. 73-4, at 168-171). Plaintiff went on to write, "I should be fine to return right, since this is what we've been waiting for" (DF ¶ 47; Dkt. No. 73-4, at 194-95), to which Whitaker responded, "[o]nce we receive a copy from DDS and see if the area office have [sic] recommendations we will be in touch" (Dkt. No. 73-4, at 194). Whitaker also informed Plaintiff that she would be out of the office the following week but would make sure Cartabona was aware of the issue in her absence (DF ¶ 48; Dkt. No. 73-4, at 194). Plaintiff then emailed Whitaker a screenshot of a page of the DPPC report reflecting that no additional protective service recommendations were being made (Dkt. No. 73-4, at 193-94). Whitaker thanked Plaintiff for the document, asked Plaintiff to continue working the schedule

she had been, and told Plaintiff that she would be in touch upon her return from vacation (Dkt. No. 73-4, at 193).

Defendant claims Plaintiff contacted Human Resources Director Ed O'Connor on April 18, 2022, "contin[uing] to inquire about returning to her prior location in Director Whitaker's absence," (DF ¶ 49) and that Plaintiff followed up with O'Connor three days later, "asking if CHD had made any decision" (DF ¶ 50). For support, Defendant cites an exhibit that contains an email chain between Plaintiff and O'Connor originating on April 21, 2022 (Dkt. No. 73-4, at 197-199). The original email, from Plaintiff to O'Connor, bears the subject "Regarding our conversation on 4/18/22," and states, "I was just wondering if any progress had been made on the situation that we'd talked about on Monday" (Dkt. No. 73-4, at 199). Plaintiff did not elaborate on what "the situation" they had talked about was. O'Connor replied to Plaintiff, advising her that he would not "be able to provide an answer until next week at the earliest," to which Plaintiff replied "Ok, thanks" (Dkt. No. 73-4, at 199). Thus, the email exhibit supports only that Plaintiff emailed O'Connor on April 21, 2022, inquiring about progress as to whatever situation they had discussed on April 18, 2022, and not whether "CHD had made any decision" about her ability to return to Parenteau Drive.

On May 4, 2022, Plaintiff emailed Cartabona reporting that a supervisor named Celeste "Cis" Bishop was "very antagonistic and it becomes harassment at certain points" (DF ¶ 53; Dkt. No. 73-4, at 201-202). According to Plaintiff, Bishop was harassing not only her, but others as well (Dkt. No. 73-4, at 201). The behavior

Plaintiff purportedly found objectionable was that Bishop would "get information from the office and dole it out in an antagonizing manner to staff," usually about "something that the person doesn't want to hear," with a "smirk on her face" (DF ¶ 53; Dkt. No. 73-4, at 201). Plaintiff stated her belief that she was "being targeted and harassed . . . by both management and her, but management is using her to do so" (DF ¶ 53; Dkt. No. 73-4, at 201). Cartabona replied to Plaintiff, indicating that she had been unaware of the difficulties and that just the day before Bishop told her that Plaintiff was doing well (DF ¶ 54; Dkt. No. 73-4, at 201). Cartabona ended by inquiring how Plaintiff wanted the situation mediated, to which Plaintiff responded, "[i]t can be mediated by me going back to my original house," and complaining that she was "being banned from Parenteau for no reason" (DF ¶¶54-55; Dkt. No. 73-4, at 201).

Plaintiff emailed O'Connor on May 5, 2022, "checking in because [she] ha[d not] heard anything back from [him]," in the nearly two weeks since April 22, 2022 (DF ¶ 55a; Dkt. No. 73-4, at 198). Plaintiff stated that she felt she was experiencing discrimination and retaliation in the form of harassment, taunting, and ignoring, including not being given a reason why she could not go back to Parenteau Drive (DF ¶ 55a; Dkt. No. 73-4, at 198). O'Connor responded that he had "sent [his] response a little prematurely . . . [as] [i]t was brought to [his] attention that [Whitaker] is asking that this issue be worked through [Cartabona] and that you use the chain of command . . . [which] is the preferred course of action for all involved, and the precedent of how CHD operates" (DF ¶ 56; Dkt. No. 73-4, at 198).

Plaintiff replied, stating, "[d]o you guys understand that this is retaliation at this point" and "[t]his issue has become [sic] to appear a personal attack on me" (DF ¶ 57; Dkt. No. 73-4, at 197).

The following day, O'Connor set up a Microsoft Teams meeting to take place on Tuesday, May 10, 2022, including him, Plaintiff, and Nothe-Hebert (DF ¶ 58; Dkt. No. 73-4, at 204). When Plaintiff indicated that she would have "representation listening on [her] end as well," O'Connor told her that would not be permitted (DF ¶¶ 59-60; Dkt. No. 73-4, at 204). Following the meeting, CHD commenced an investigation into Plaintiff's complaints of discrimination and retaliation (DF ¶ 61; Dkt. No. 73-4, at 206).

Shortly thereafter, on May 16, 2022, Plaintiff sent an email to Nothe-Hebert, copying Whitaker, Cartabona, and O'Connor, reporting that Bishop was "taunting and bothering" her again, this time regarding whether medications had been given on an overnight shift (DF ¶ 62; Dkt. No. 73-4, at 208). Plaintiff sent another email on May 24, 2022, including the same recipients and stating that Bishop had taken her out of a group text and failed to offer her any shifts until she reported the issue (DF ¶¶ 64-65; Dkt. No. 73-4, at 210-11). Plaintiff went on to claim that Defendant's refusal to allow her to go back to Parenteau Drive represented retaliation and discrimination, as did "everything that [Cartabona] and [Whitaker] ha[d] done since March 13, 2022" (Dkt. No. 73-4, at 210). O'Connor promptly emailed Whitaker, copying Nothe-Hebert, reminding Whitaker that Plaintiff had "to be treated like any other employee," and could not be retaliated against even if her complaints

proved to be unfounded (DF ¶ 66; Dkt. No. 73-4, at 213). O'Connor also asked Whitaker to speak to Bishop and tell her to put Plaintiff back on the group text, offer her shifts, and keep her interactions with Plaintiff "brief and professional" (DF ¶ 66; Dkt. No. 73-4, at 213).

CHD completed its investigation of Plaintiff's complaints on June 3, 2022, and scheduled a meeting with Plaintiff to follow-up on June 10, 2022 (DF ¶ 68; Dkt. No. 73-4, at 215-16). Plaintiff indicated that she would attend the meeting but expressed dissatisfaction with the investigation, saying that her claims of racial discrimination had not been addressed because the only employees interviewed were the individuals accused of discrimination (DF ¶¶ 69-73; Dkt. No. 73-4, at 215-216). CHD's investigation found that Plaintiff's allegations of racial discrimination and unlawful retaliation were not substantiated but that Bishop had engaged in concerning behavior, including negative communications with a resident, staring for extended periods at two staff members, not interacting with staff or residents or listening to their needs, and threatening to punch or slap a staff member in the face (DF ¶ 74; Dkt. No. 73-4, at 218-221). In the report, Nothe-Hebert recommended, among other things, that Bishop be placed on a six-month performance improvement plan and undergo biweekly coaching sessions for three months (DF ¶ 75; Dkt. No. 73-4, at 221). Plaintiff was told to report any further acts that she suspected might be discriminatory or retaliatory (DF ¶ 75).

Defendant represents that, at the time of the meeting, it decided to maintain Plaintiff at program sites other than Parenteau Drive and that it communicated

this decision to Plaintiff in writing and orally during the meeting (DF ¶¶ 76-77). Defendant cites portions of Plaintiff's deposition that do not support its representations other than Plaintiff's less-than-definitive testimony that at the meeting, "I'm pretty sure it was said for me to stay wherever I, you know, the house that I was in at the time" (Dkt. No. 73-4, at 121).

Approximately one month later, on July 14, 2022, Plaintiff sent Whitaker a text message asking to be removed from another supervisor's schedule because of a "hostile work environment going on in her house," involving "nitpicking, tit for tat, and pettiness" (DF ¶ 80; Dkt. No. 73-4, at 248). Cartabona reached out to Plaintiff asking if she had provided Bishop with a list of sites where she wanted to work so that she, Cartabona, could ensure Plaintiff was on Bishop's contact list to be notified of open shifts at those sites (DF ¶ 81; Dkt. No. 73-4, at 265). Plaintiff responded, objecting to having to use Bishop as a go between for shifts when she had already advised management that Bishop "plays games" (Dkt. No. 73-4, at 265).

On August 2, 2022, Plaintiff sent an email to Whitaker, copying Cartabona, with the subject, "Extending an olive branch" (DF ¶ 82; Dkt. No. 73-4, at 224-25). In the email, Plaintiff asked about picking up shifts at Parenteau Drive again, even if it was just a trial run situation (Dkt. No. 73-4, at 224). She stated that "[e]veryone . . . said it wouldn't be forever," and she expressed that she missed the staff and residents there (*id.*). Plaintiff indicated that she had been close with the resident she had the altercation with and that the resident had just been going through a rough patch that had since resolved (*id.*). Whitaker forwarded Plaintiff's email to

Nothe-Hebert and O'Connor, prompting Nothe-Hebert to respond, "I feel we have to stay firm on this. Am I missing anything that we would want to reevaluate this?" (DF ¶ 83; Dkt. No. 73-4, at 223-24). On August 5, 2022, Whitaker advised Plaintiff by telephone that, as director, she was making the final decision with team input and based on program needs and the needs of individuals that Plaintiff would not be assigned to work at Parenteau Drive (DF ¶ 84; Dkt. No. 73-4, at 223, 227).

Defendant represents that Whitaker's call to Plaintiff took place after further discussion and input from CHD management and that Whitaker "informed [Plaintiff] that consistent with CHD's prior determination, Plaintiff would remain assigned to other program locations" (DF ¶ 84). The email Defendant cites for support does not establish that Whitaker had further discussions, and there is no evidence in the record that CHD had communicated to Plaintiff at any time before this that the decision not to allow her to pick up shifts at Parenteau Drive was final. Plaintiff maintains that the decision to permanently prevent her from working at Parenteau Drive was not made until this point in time, i.e., after she sent her "olive branch" email (Dkt. No. 78, at 5).

Following her phone conversation with Whitaker, Plaintiff sent an email to Nothe-Hebert and Goodwin that same day, August 5, 2022, titled "Racism and retaliation," stating that Whitaker was racist and had retaliated against her (DF ¶ 85; Dkt. No. 73-4, at 228-29). Plaintiff objected to having been told initially that her inability to pick up shifts at Parenteau Drive would not be permanent, but "[n]ow because [she] reported [Whitaker,] she's retaliating and saying it's a permanent

decision that she doesn't have to explain because she's the Director" (DF ¶ 86; Dkt. No. 73-4, at 228). Plaintiff suggested the retaliation was the result of advocating for individuals CHD serves (Dkt. No. 73-4, at 228).

Plaintiff was asked to attend a meeting on August 9, 2022 regarding her new complaints, but declined the meeting, saying she had to work (DF ¶¶ 89, 92; Dkt. No. 73-4, at 126-27). Plaintiff also sent an email on August 8, 2022, to Nothe-Hebert, stating that she would not meet with O'Connor without a lawyer present because "he is a bully who in his own words 'works for CHD' and not there to help the employees of CHD," and indicating that she "didn't agree to any meeting" (DF ¶ 90; Dkt. No. 73-4, at 233). Nothe-Hebert offered to call Plaintiff, but Plaintiff replied that she would "be corresponding via email, so that words aren't twisted or important things aren't omitted" (Dkt. No. 73-4, at 232). Nothe-Hebert and O'Connor then had some email correspondence about Nothe-Hebert calling or emailing Plaintiff about the proposed meeting, but there is no evidence in the record that Nothe-Hebert did either (*id.*).

Plaintiff sent an email to Carol Fitzgerald, requesting that Fitzgerald "ask [her] subordinate Edward O'Connor to stop harassing [her]" (Dkt. No. 73-4, at 236). Defendant represents that Plaintiff sent the email on August 9, 2022, at 9:20 a.m., and suggests that this supports an inference that Plaintiff was lying when she refused to meet with O'Connor and Nothe-Hebert at 9:00 a.m. that day due to having to work (DF ¶¶ 93, 101). Even if Plaintiff's sending of an email during her claimed shift could support an inference that she was not actually working at the

time, a dubious proposition in its own right, the exhibit is devoid of a date or time stamp establishing when it was sent, and no other evidence in the record establishes that it was sent at 9:20 a.m. on August 9, 2022, as Defendant claims (Dkt. No. 73-4, at 236).

At 12:37 p.m. on August 9, 2022, O'Connor left Plaintiff a voicemail informing her that she was suspended until she rescheduled the meeting, prompting Plaintiff to apply for unemployment (DF ¶¶ 95-96; Dkt. No. 73-4, at 127, 246). However, later that same day, O'Connor sent a letter to Plaintiff informing her that her employment relationship with CHD was being terminated because she "repeatedly . . . made inaccurate statements and false representation," "refused to take reasonable direction from management," and "displayed insubordination by hanging up on CHD's management officials, refusal to engage in official communications, and refusal to accept meetings" (DF ¶¶ 97-98; Dkt. No. 73-4, at 239). Plaintiff reported hearing from other staff that she had been fired (Dkt. No. 73-4, at 127, 246). According to an email from Plaintiff to O'Connor dated August 11, 2022, she was waiting on him to reschedule the meeting because, while he told her to reschedule it, he also told her to wait for him to call with further instructions (Dkt. 73-4, at 242).

## V. Discussion

In Plaintiff's pro se complaint, she alleges that Defendant is liable for race discrimination, harassment, and unlawful retaliation. The court addresses each of Plaintiff's theories in turn.

A. Race Discrimination

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. §2000e-2(a)(1). It is also a violation of state law to "refuse to hire or employ, to terminate, or to discriminate against any individual based on race or color." *Gaitor v. City of Boston*, No. 21-cv-12079-AK, 2025 WL 2655192, at *11 (D. Mass. Sept. 16, 2025) (citing Mass. Gen. Laws ch. 151B, § 4(1)). "These state and federal claims are analyzed under the same standard, as it is Massachusetts courts' 'practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. c. 151B.'" *Id.* (quoting *Wheatley v. Am. Tel. & Tel. Co.*, 636 N.E.2d 265, 268 (Mass. 1994)).

Where there is no direct evidence of discrimination, courts apply the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 112-13 (1st Cir. 2015). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case by showing that: "(1) she is 'a member of a protected class'; (2) she is 'qualified' for the job . . . ; (3) she has 'suffer[ed] an adverse employment action at the hands of her

employer'; and (4) there is 'some evidence of a causal connection between her membership in a protected class and the adverse employment action.'" *Luceus v. Rhode Island*, 923 F.3d 255, 258 (1st Cir. 2019) (quoting *Bhatti v. Trs. of Boston Univ.*, 659 F.3d 64, 70 (1st Cir. 2015)). If the plaintiff meets her prima facie burden, a presumption of discrimination arises, and "the burden of production shifts to the defendant[ ], who 'must establish a legitimate, nondiscriminatory justification for the adverse employment action.'" *Id.* (quoting *Ray*, 799 F.3d at 113). If the defendant meets this burden, the presumption of discrimination disappears, and the plaintiff must carry the ultimate burden of proving discrimination. *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 62 (1st Cir. 1999). At the Rule 56 stage, the plaintiff may avoid summary judgment only by "'rais[ing] a genuine issue of material fact that "the reasons offered by [the defendant[ ]] were a pretext for discrimination."'" *Luceus*, 923 F.3d at 258 (quoting *Ray*, 799 F.3d at 113).

Defendant does not dispute Plaintiff's ability to satisfy the first two elements of her case but argues that Plaintiff cannot establish the third and fourth. "An 'adverse employment action' is one that 'affect[s] employment or alter[s] the conditions of the workplace.'" *Osinubi v. Sanofi Pasteur, Inc.*, No. 1:25-cv-12262-JEK, 2026 WL 986193, at *5 (D. Mass. Apr. 13, 2026) (quoting *O'Horo v. Bos. Med. Ctr. Corp.*, 131 F.4th 1, 17 (1st Cir. 2025)). "[D]iscrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits,'" qualify as adverse employment actions. *O'Horo*, 131 F.4th at 17-18

(quoting *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010)). In addition to these distinct changes, an adverse action includes "any employment event, regardless of its severity, in which an employer's conduct leaves an employee (1) 'worse off' (2) with respect to the 'terms [or] conditions' of their employment." *Walsh v. HNTB Corp.*, 169 F.4th 330, 339 (1st Cir. 2026) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024)).

While termination of employment plainly qualifies as an adverse employment action, Defendant maintains that Plaintiff has not claimed that she was fired because of her race or color, and the court agrees. A careful review of Plaintiff's pleadings reveals that she has not advanced such a claim. As to the decision to ban Plaintiff from Parenteau Drive after the March 11, 2022, incident, Defendant argues that the decision does not qualify as an adverse employment action because Plaintiff retained the same position, duties, and pay. For support, Defendant cites *Billings v. Town of Grafton*, 441 F. Supp. 2d 227, 240 (D. Mass. 2006), *aff'd in part, vacated in part, remanded*, 515 F.3d 39 (1st Cir. 2008), for the proposition that "[a] transfer that does not materially disadvantage an employee is not an adverse employment action, 'even if it causes the plaintiff to feel stigmatized or punished" (Dkt. No. 73-1, at 9 (quoting *Billings*, 441 F. Supp. 2d at 240)).

Defendant's reliance on *Billings* is unavailing for several reasons. First, the *Billings* court's holding that the plaintiff had not established an adverse employment action based on her involuntary transfer from a position as a secretary in one town department to a secretary in another because she retained the same

salary and benefits and performed the same duties, notwithstanding the "objectively slight" difference in prestige attached to the positions, was reached in the context of a claim of retaliation, not discrimination. *Id*. at 238-42. The standard for establishing an adverse employment action for purposes of a claim of discrimination is not the same as that for a claim of retaliation. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("Title VII's substantive provision and its antiretaliation provision are not coterminous."). Second, even if *Billings* involved the standard for a discrimination claim, the decision was overturned on appeal. *Billings*, 515 F.3d at 54. The First Circuit disagreed with the district court's finding that the plaintiff's complaints "ar[o]se largely out of her own subjective feelings of disappointment," *Billings*, 441 F. Supp. 2d at 240, and concluded instead that a jury could find that the transfer to "an objectively less prestigious job, reporting to a lower ranked supervisor, enjoying much less contact with the Board, the Town, and members of the public, and requiring less experience and fewer qualifications" could "well dissuade a reasonable worker from making or supporting a charge of discrimination." *Billings*, 515 F.3d at 54 (quoting *Burlington N.*, 548 U.S. at 57) (applying the standard for an adverse employment action in the context of a claim of retaliation). Lastly, the district court's analysis in *Billings* that the plaintiff's "ostensibly lateral job transfer" was not materially adverse because it "did not amount in substance to a demotion," *id*. at 240-41, relied on the First Circuit standard applied in *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7 (1st Cir. 2002), that a plaintiff "show that the adverse action was material, i.e., that the challenged

conduct was 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Walsh*, 169 F.4th at 339 (quoting *Marrero*, 304 F.3d at 23). However, the Supreme Court has since "rejected th[e] materiality requirement . . . [holding] that an adverse action is any employment event, regardless of its severity, in which an employer's conduct leaves an employee (1) 'worse off' (2) with respect to the 'terms [or] conditions' of their employment." *Id.* (quoting *Muldrow*, 601 U.S. at 354-55). An action's effect need not be serious or substantial to be considered adverse, but a "plaintiff must still demonstrate that terms or conditions of her employment have changed" for the worse. *O'Horo*, 131 F.4th at 18 (citing *Muldrow*, 601 U.S. at 356 & n.2).

The record here establishes a change in the terms or conditions of Plaintiff's employment, namely that she was precluded from working at Parenteau Drive, where she had previously worked most of her hours. The only remaining question for purposes of the adverse action inquiry, then, is whether the Parenteau Drive ban "left her worse off," even if "not . . . significantly so." *Muldrow*, 601 U.S. at 359. The record, viewed in the light most favorably to Plaintiff, satisfies this requirement. Plaintiff went from having a permanent schedule in a home where she had developed positive relationships with other staff and residents over a two-plus year period, to having an inconsistent schedule in other homes lacking those

connections. It is inconsequential that Plaintiff's title and pay remained the same. *Id*. ("It does not matter . . . that her rank and pay remained the same . . . .").

This leads to the fourth element of Plaintiff's prima facie case, namely a causal connection between Plaintiff's membership in a protected class and the adverse action. Careful review of the record reveals no evidence that Defendant decided to prohibit Plaintiff from working at Parenteau Drive because of her race. The sole evidence before the court relating to race consists of Plaintiff's representations that Whitaker and Cartabona made what she perceived to be racially insensitive comments. According to Plaintiff, Whitaker made a statement to the effect that all the staff at Parenteau Drive were from Springfield, which Plaintiff infers is because they were all of color, and she made a comment to Plaintiff assuming that she is a single mother, which Plaintiff infers is because she is Black (Dkt. No. 1, at 7; Dkt. No. 73-4, at 123, 245-46, 261-62).[3] Cartabona's statement that Plaintiff found offensive was that "everyone in the house would get along with [Rucks] because [they] all have similar 'personalities,'" which Plaintiff took to mean that the staff, all of whom were women of color, would get along with Rucks because she is Black (Dkt. No. 73-4, at 262). Assuming for purposes of summary judgment that Whitaker and Cartabona made these comments, they are insufficient to prove causation. First, "it is far from clear that the alleged remarks bespeak any [race]-based animus at all." *Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69

[3] Plaintiff also claims that a client reported hearing Whitaker refer to the staff as "Black bitches from Springfield" (Dkt. No. 1, at 7; Dkt. No. 73-4, at 178, 246) but she offers no admissible evidence that Whitaker made this comment.

(1st Cir. 2002) (citing *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 583 (1st Cir. 1999); *Speen v. Crown Clothing Corp.*, 102 F.3d 635, 636 (1st Cir. 1996); *Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 329 (1st Cir. 1996)). "At the summary judgment stage, a plaintiff offering facially neutral statements as evidence of discriminatory motive must guide the court in demonstrating how the statements evince discriminatory animus. [The plaintiff's] subjective perception, standing alone, is not enough." *O'Horo*, 131 F.4th at 21 (citing *Henderson v. Mass. Bay Transp. Auth.*, 977 F.3d 20, 29 (1st Cir. 2020)). Given that these ambiguous comments lack the force to establish racial animus, they are likewise incapable of establishing a causal link between Plaintiff's race and her removal from Parenteau Drive. Were the court to reach the third step of *McDonnell Douglas*, these remarks would also be insufficient to establish pretext. *Id*. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim of race discrimination.

B. <u>Hostile Work Environment</u>

It is not entirely clear whether Plaintiff seeks to pursue a hostile work environment theory. In opposing summary judgment, Plaintiff characterizes her claim as one of "harassment," which she lays at the hands of Bishop (Dkt. No. 78, at 9). Yet Plaintiff concedes that she has not claimed that Bishop said or did anything racist and does not believe Bishop's actions were racially motivated (*id*.). Thus, to

the extent Plaintiff seeks to impose liability for a racially hostile work environment, it would have to be laid on Whitaker's and Cartabona's comments discussed above.

'To prevail on a [race]-based hostile work environment claim, a plaintiff must establish the following six elements: '(1) unwelcome harassment that was (2) severe or pervasive, and (3) both objectively and subjectively offensive,' and (4) that she was a 'member[ ] in a protected class, (5) that the harassment was motivated by [race], and (6) [that there is] a basis for employer liability.'"[9] *O'Horo*, 131 F.4th at 19 (second and fourth alterations in original) (quoting *Maldonado-Cátala v. Mun. of Naranjito*, 876 F.3d 1, 10 n.11 (1st Cir. 2017)). The standard is high. A plaintiff "must show that the 'workplace was "permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive working environment."'" *Id.* (alteration in original) (quoting *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 91 (1st Cir. 2018)). Plaintiff does not come close. As discussed, the challenged comments are ambiguous, and, therefore, standing alone cannot establish race-based discriminatory animus. *O'Horo*, 131 F.4th at 20 (declining to consider evidence in connection with the plaintiff's hostile work environment claim where the plaintiff presented no evidence connecting the challenged conduct to gender based discriminatory animus). Moreover, they consist of "isolated, stray remarks whose substance and frequency cannot provide adequate foundation for a hostile work environment claim." *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 87 (1st Cir.

2016). These comments, taken together, are neither pervasive nor severe enough to meet the standard of creating an abusive working environment.

C. Retaliation

"Title VII expressly forbids not only direct discrimination, but also retaliation against an individual who has complained about discriminatory employment practices." *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 114-15 (1st Cir. 2024) (quoting *Velazquez-Ortiz v. Vilsack*, 657 F.3d 64, 72 (1st Cir. 2011)). Massachusetts state law also prohibits retaliation against an individual for opposing unlawful employment discrimination. Mass. Gen. Laws ch. 151B, § 4(4). The ***McDonnell Douglas*** burden shifting framework that applies to claims of discrimination applies to claims of retaliation as well. *Quintana-Dieppa v. Dep't. of Army*, 130 F.4th 1, 13 (1st Cir. 2025); *Gaitor*, 2025 WL 2655192, at *19 (noting that Massachusetts state law retaliation claims employ the same burden shifting framework). "To establish a prima facie case of retaliation, [a p]laintiff must 'show that (1) she undertook protected conduct; (2) she suffered an adverse employment action[;] and (3) the two were causally linked." *Cherkaoui v. City of Quincy*, 877 F.3d 14, 28 (1st Cir. 2017), *abrogated on other grounds*, *Walsh*, 169 F.4th at 330 (quoting *Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005)). "From there, 'the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions.'" *Kinzer*, 99 F.4th at 115 (quoting *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015)). Lastly, the burden shifts back to the plaintiff to "show that the defendant's explanation is a pretext for unlawful retaliation." *Id.*

(quoting *Planadeball*, 793 F.3d at 175). While the plaintiff need not prove retaliation at the summary judgment stage, she must "raise a genuine issue of fact as to whether retaliation motivated the adverse employment action." *Id.* (quoting *Collazo v. Bristol-Meyers Squibb Mfg., Inc.*, 617 F.3d 39, 50 (1st Cir. 2010)).

Defendant first argues that Plaintiff did not engage in protected activity within the meaning of Title VII. Title VII's prohibition on retaliation encompasses "oppos[ing] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). A complaining employee "need not prove that the conditions against which [s]he protested actually amounted to a violation of Title VII." *Kinzer*, 99 F.4th at 115 (quoting *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009)). It is sufficient that she possessed a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Id.* (quoting *Fantini*, 557 F.3d at 32). *See also Psy-Ed Corp. v. Klein*, 947 N.E.2d 520, 530 (Mass. 2011) ("A claim of retaliation may succeed even if the underlying claim of discrimination fails, provided that in asserting her discrimination claim, the claimant can 'prove that [she] reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination.'" (alteration in original) (quoting *Abramian v. President & Fellows of Harvard Coll.*, 731 N.E.2d 1075, 1087 (Mass. 2000))). According to Defendant, Plaintiff lacked a good faith, reasonable belief that Whitaker made racially insensitive comments; that Whitaker and Cartabona were racist and retaliating against her; that Nothe-Hebert was lying

about her investigation into Plaintiff's discrimination and retaliation complaints; and that O'Connor allowed racism and discrimination to persist at CHD.

In support of its argument that Plaintiff cannot meet the protected conduct element of the prima facia case, Defendant relies on *Monteiro v. Poole Silver Co.*, 615 F.2d 4 (1st Cir. 1980), in which the First Circuit upheld a judgment of the district court entered after a non-jury trial. In *Monteiro*, the court found that the trial judge did not err in concluding that the plaintiff's accusations of discrimination were "raised as a smokescreen in challenge to [his] supervisor's legitimate criticism," and not "in response to some honestly held, if mistaken, feeling that discriminatory practices existed." *Id.* at 8 (alteration in original). In reaching its holding, the First Circuit noted that "[w]here the motive of an employee in voicing allegations of employer misconduct is in issue, the trier's credibility determinations are entitled to great weight." *Id.* (citation omitted).

Defendant's reliance on the *Monteiro* decision, involving review of the entry of judgment after a trial and based on the judge's credibility assessment, is inapposite at the summary judgment stage. There is a dispute of fact over whether Plaintiff possessed a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Kinzer*, 99 F.4th at 116 (quoting *Fantini*, 557 F.3d at 32). She maintains that she did, and it is not for this court to decide on summary judgment who is telling the truth. "'Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge' on summary judgment." *Wirth v. Salesforce, Inc.*, Civil Action

No. 23-11718-BEM, 2026 WL 1132926, at *3 (D. Mass. Apr. 27, 2026) (alteration omitted) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).

Having concluded that Plaintiff satisfies the protected conduct element of her prima facie case of retaliation, the court moves on to the question of whether she can establish adverse action. Defendant concedes that Plaintiff's termination qualifies as an adverse action but skips over her removal from Parenteau Drive as a possible adverse action, perhaps relying on its earlier argument that her removal from Parenteau did not qualify as an adverse action for purposes of her discrimination claim. This is problematic for Defendant for two reasons. First, the court has found that Plaintiff's removal from Parenteau Drive does qualify as an adverse action for purposes of her discrimination claim. Second, the adverse action standard for a retaliation claim is different than it is for a discrimination claim. For purposes of a retaliation claim under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Burlington N.*, 548 U.S. at 57 (quoting *Rochon v. Gonzalez*, 438 F.3d 1211, 1219 (C.A.D.C. 2006))).

Plaintiff is not claiming that her initial removal from Parenteau Drive was retaliatory. She testified that she viewed Defendant's removal of her from the house initially as "understandable," given the interaction with the client and the client's complaint against her (Dkt. No. 73-4, at 120). Plaintiff's claim of retaliation relates to Defendant's decision to remove her from Parenteau permanently, which, viewing

the record most favorably to Plaintiff, did not occur until Whitaker advised her that the decision to prohibit her from working at Parenteau Drive was final on August 5, 2022. The standard for whether an action is adverse for purposes of a retaliation claim is an objective one, therefore "[a]n employee's subjective reaction to a claimed act of retaliation is not determinative." *Lima v. City of E. Providence*, 17 F.4th 202, 209 (1st Cir. 2021) (citing *Burlington N.*, 548 U.S. at 68-69). "[R]etaliation need not have 'a dramatic impact' on a plaintiff's job or even 'relate to the terms or conditions of employment.'" *Stratton v. Bentley Univ.*, 113 F.4th 25, 44 (1st Cir. 2024) (quoting *Billings*, 515 F.3d at 54). Applying this objective standard, Plaintiff has put forth sufficient facts for a factfinder to find that an adverse action occurred. A reasonable employee might well be dissuaded from making a charge of discrimination if it results in the employer depriving her of "something of consequence." *Tourangeau v. Nappi Distributors*, 648 F. Supp. 3d 133, 210 (D. Me. 2022) (quoting *Blackie v. State of Maine*, 75 F.3d 716, 725 (1st Cir. 1996)). The "something of consequence" that was taken from Plaintiff was her ability to work shifts at her preferred site where she had built positive relationships with other staff and clients over a two-year period.

The final element Plaintiff must satisfy for her prima facie case is that of a causal connection. For this, Plaintiff relies on "temporal proximity between the protected conduct . . . and the adverse action that grounds each of [her] claims of retaliation." *Rivera-Velázquez v. Regan*, 102 F.4th 1, 13 (1st Cir. 2024) (citing *Wyatt v. City of Boston*, 35 F.3d 13, 16 (1st Cir. 1994)). The temporal proximity must be

"very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). The four days between Plaintiff's August 5, 2022, email to Nothe-Hebert and Goodwin reporting that Whitaker was a racist and had retaliated against her and O'Connor's August 9, 2022, termination of Plaintiff's employment is easily close enough in time to raise an inference of retaliation. *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 25 (1st Cir. 2004) ("We have held that 'a showing of discharge soon after the employee engages in an activity specifically protected by . . . Title VII . . . is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation.'" (alterations in original) (quoting *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 110 (1st Cir.1988)).

Plaintiff's permanent removal from Parenteau Drive presents a more difficult question. Plaintiff's last complaint of discriminatory and retaliatory conduct before Defendant's August 5, 2022, final decision to bar her from working at Parenteau Drive (which Whitaker communicated to Plaintiff before Plaintiff sent her August 5, 2022, email) was a May 24, 2022, email she sent to Nothe-Hebert, copying Whitaker, Cartabona, and O'Connor, asserting that Defendant's continued refusal to allow her to go back to Parenteau Drive represented discrimination and retaliation. This represents a difference of 73 days, or two months and two weeks. The First Circuit has held that "'[w]ithout some corroborating evidence suggestive of causation . . . a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action.'" *Pena v.*

*Honeywell Int'l, Inc.*, 923 F.3d 18, 32 (April 2019) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010)). As such, a four-month gap, "on its own, is not 'very close' for establishing causality." *Id.* (quoting *Cherkaoui*, 877 F.3d at 29). On the other hand, the First Circuit has declined to "opine on whether three and a half months . . . is too long to create on inference of causation," *Stratton*, 113 F.4th at 49 n.21, but has held that the filing of a complaint of discrimination in February and an allegedly retaliatory act occurring in May is "close enough to suggest causation, especially given the inferences [the court] must draw" in the plaintiff's favor on summary judgment.[4] *Sánchez-Rodríguez v. AT&T Mobility Puerto Rico*, *Inc.*, 673 F.3d 1, 15 (1st Cir. 2012). This court concludes that the two month and two-week gap here between Plaintiff's most recent complaint of alleged discriminatory and retaliatory action and the alleged retaliatory act is sufficient to create an inference of causation for her prima facie case. *See Couture v. AmeriGas Propane, Inc.*, No.

[4] The First Circuit did not identify the precise length of the gap between the complaint of discrimination and the allegedly retaliatory act in *Sánchez-Rodríguez*, stating only that "Sánchez filed his EEOC complaint in February of 2007 and was disciplined in May of 2007." *Sánchez-Rodríguez*, 673 F.3d at 15. The District Court's underlying decision used the same dates, based on the parties' stipulation that the EEOC complaint was filed "on or around February 2007," and the retaliatory act occurred "on or around May 2007." *Sánchez-Rodríguez v. AT&T Wireless*, Civ. No. 3:07-cv-02237-FAB, Dkt. No. 23, ¶¶ 22, 28 (D.P.R. Apr. 7, 2009); *Sánchez-Rodríguez v. AT&T Wireless*, 728 F. Supp. 2d 31, 36-37 (D.P.R. 2010); *see also id.*, at 44-45. In two later decisions, the First Circuit identified the gap in *Sánchez-Rodríguez* as three months. *See Pena*, 923 F.3d at 32 n.10 (explaining that in *Sánchez-Rodríguez* the adverse action occurred "three months" after the protected conduct); *Planadeball*, 793 F.3d at 179 (stating that in *Sánchez-Rodríguez* "approximately three months had transpired between the protected conduct and the material adverse action.").

2:15-cv-529-NT, 2016 WL 5720715, at *4 (D. Me. Oct. 3, 2016) ("Following the First Circuit . . . a reasonable fact finder could determine that the thirteen weeks . . . is 'close enough' to establish a causal link.") (citing *Sánchez-Rodríguez*, 673 F.3d at 15)); *Vil v. Price WaterhouseCoopers LLP*, Civil Action No. 11-10780-GAO, 2012 WL 3202852, at *16 (D. Mass. Aug. 2, 2012) (concluding that an adverse action employment action occurring within three months of protected activity is sufficient to establish temporal proximity for a Title VII claim) *See also Cáez v. Universidad de P.R.*, Civil No. 20-01003 (GMM), 2023 WL 4489414, at *13 (D.P.R. July 11, 2023) ("First Circuit caselaw establishes that, under certain circumstances, a 3-month gap between the protected activity and the adverse employment action is 'close enough to suggest causation.'" (citing *Sánchez-Rodríguez*, 673 F.3d at 15)).

With Plaintiff having made her prima facie showing both with respect to Defendant's termination of her employment and its final decision to bar her from Parenteau Drive, the burden shifts to Defendant to articulate a legitimate, non-retaliatory reason for its employment decisions. Defendant's proffered reason for its termination of Plaintiff's employment is Plaintiff's insubordinate conduct, her refusal to meet with her managers, and making inaccurate and false statements. There is no evidence in the record that Plaintiff disobeyed any directives given to her by management. Nor is there any evidence that Plaintiff refused to meet with her managers. The record reflects that O'Connor asked Plaintiff to attend a meeting regarding her new allegations at 9:00 a.m. on August 9, 2022, but Plaintiff communicated that she was unable to attend a meeting at that time because she

had to work. Defendant intimates that Plaintiff was lying because she sent an email to Fitzgerald at 9:20 a.m., but neither establishes that the email was sent during the meeting time nor explains how Plaintiff's working at the time would have precluded her from sending a work-related email. Finally, even after Plaintiff did not appear for the meeting that she had advised O'Connor and Nothe-Hebert that she would not attend, O'Connor first told Plaintiff that she was suspended until she rescheduled the meeting, but then terminated her employment later that day without allowing her the opportunity to reschedule. Taken together, this evidence does not substantiate that Plaintiff refused to meet with her managers. The last reason Defendant advances is that Plaintiff made inaccurate and false statements, without identifying what those inaccurate or false statements were. To the extent that Defendant is arguing Plaintiff's statement that Whitaker was discriminating against and retaliating against her by permanently barring her from working at Parenteau Drive is inaccurate or false, Defendant puts the cart before the horse.

Moreover, Defendant's overarching characterization of Plaintiff as having "embarked on a campaign to pressure CHD into reversing [its decision to remove Plaintiff from Parenteau Drive]" is not supported by the record (Dkt. No. 73-1, at 1). Certainly, a reasonable fact finder could conclude that Plaintiff wanted to go back to Parenteau Drive, the home where she had primarily worked for over two years and had formed positive relationships with other staff and residents. Yet, there is nothing inherently wrong with such a desire, and the record does not reflect Plaintiff having embarked on an improper pressure campaign. According to the

record before the court, Rucks told Plaintiff on March 14, 2022, that her removal from Parenteau Drive might be for about a week, and Whitaker assured her that the hope was that she could go back sooner than later. After that week passed, on March 23, 2022, Plaintiff inquired of Whitaker whether she could go back to her shifts at Parenteau Drive. At that time, Whitaker told Plaintiff that she would have to work at other homes until the DPPC investigation was complete. Plaintiff did not raise the issue of her return to Parenteau Drive with Whitaker again until April 14, 2022, when she obtained a copy of the completed investigation report reflecting that the resident's accusations against Plaintiff were unsubstantiated and no recommendations were being made.

Defendant claims that, upon being told by Whitaker that she would be out the following week and Plaintiff would have to wait to see about a return to Parenteau Drive, Plaintiff raised the issue with O'Connor on April 18, 2022. However, as discussed, the record does not establish why Plaintiff reached out to O'Connor on April 18, 2022.[5] Nor is it possible to square Defendant's characterization of Plaintiff's complaints of mistreatment by Bishop as Plaintiff "[r]esort[ing] to [a]lternate [m]eans to [r]eturn to Parenteau Drive" (Dkt. No. 73-2, at 9), when Defendant's own internal investigation found "evidence to show concerns with [Bishop's] behavior" (Dkt. No. 73-4, at 220-221). Defendant

[5] Even assuming arguendo that the record supported this assertion, O'Connor told Plaintiff that she would have to wait at least until the following week for an answer, but he did not respond to her again until May 5, 2022, a passage of over two weeks, and even then only after Plaintiff reached out to him to follow-up.

represents that, during a June 10, 2022 meeting with Plaintiff to go over the results of its investigation of her complaints, it told her, ora lly and in writing, that she would continue to be scheduled at locations other than Parenteau Drive, implying that the decision that was made and communicated was permanent. Again, the record does not support this representation. Instead, the record reflects that Defendant told Plaintiff she would be staying at the house she was in at that time, with no evidence that Defendant told Plaintiff that it would be permanent. Plaintiff did not raise the issue again for almost two months after that meeting (and four months after the DPPC investigation resolved) when she sent her August 2, 2022, email to Whitaker, asking if she could at least go back on a trial basis. It was only then, on August 5, 2022, that Plaintiff was told that the decision not to allow her back at Parenteau Drive was final.

This record does not support the characterization of Plaintiff as an employee badgering and trying to force her employer into changing course. Instead, it reflects an employee who was told by her employer of a temporary reassignment and who followed up on that decision at reasonable intervals. Because Defendant has not established a legitimate, non-discriminatory reason for its termination of Plaintiff's employment, Defendant has not rebutted the inference of retaliation arising from Plaintiff's prima facie case. Accordingly, Defendant is not entitled to summary judgment on Plaintiff's retaliation claim as it relates to the termination of her employment.

As to Defendant's final decision to bar Plaintiff from Parenteau Drive, Defendant maintains that it decided not to return Plaintiff to Parenteau Drive because the March 2022 incident had resulted in injuries to both Plaintiff and the client and because the client remained unstable (Dkt. No. 73-1, at 10). However, Defendant knew that both Plaintiff and the client were injured immediately after the incident in March but did not make a final decision to bar Plaintiff from Parenteau Drive until August. Defendant offers no explanation for moving from a temporary reassignment of Plaintiff in March to a permanent bar in August. In addition, Defendant has not offered any evidence to substantiate its claim that the client remained unstable in August and would so remain thereafter. Thus, Defendant's asserted reason is insufficient to defeat the inference of retaliation raised by Plaintiff's prima facie case as to its final decision to bar Plaintiff from Parenteau Drive.

## VI. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 73) is GRANTED as to Plaintiff's claims of discrimination and hostile work environment but DENIED as to Plaintiff's claim of retaliation. The parties are directed to request a mutually convenient date for a status conference from the Clerk's Office.

It is so ordered.

Dated: August 19, 2026

CHRISTOPHER L. MORGAN
U.S. MAGISTRATE JUDGE